## BURNES v. EPSTEIN.

(District Court, D. Connecticut. January 6. 1913.)

### No. 1,660.

1. BANKRUPTCY (§ 178*)—TRANSFERS BY BANKRUPT—COLLATERAL SECURITY —INSOLVENCY—KNOWLEDGE BY TRANSFEREE.

Where defendant sold a bankrupt a car of metal, which became a part of the assets of the bankrupt's estate, but for which he was unable to pay, defendant was entitled to retain certain notes of third persons

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and a check received from the bankrupt either as payment for the metal or as collateral security, whether he knew of the bankrupt's insolvency at the time or not.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 221, 264–274, 283, 284; Dec. Dig. § 178.*]

2. BANKRUPTCY (§ 250*)—ASSETS—CHECKS.

A bankrupt, being indebted to defendant, sent him a check for $4,300, but, being unable to meet it requested defendant to send his check for $1,325 for that purpose. This having been done, the bankrupt again telephoned defendant that he could not meet the $4,300 check by the use of defendant's check, and suggested that defendant might as well stop payment on his own check, which he did, and when it was presented it was protested. *Held,* that such protested check was not an asset of the bankrupt's estate which the trustee could enforce against defendant.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 235, 350; Dec. Dig. § 250.*]

3. BANKRUPTCY (§ 303*)—TRANSFERS—PREFERENCES.

Evidence *held* insufficient to show that defendant had reasonable cause to believe that a bankrupt was insolvent at the time he delivered certain securities to defendant, either as collateral or payment on his indebtedness to defendant, or that the bankrupt intended thereby to create a preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. § 303.*]

At Law. Action by George R. Burnes against Benjamin Epstein. Judgment for defendant.

Slade, Slade & Slade, of New Haven, Conn., for plaintiff.
Bronson & Lewis, of Waterbury, Conn., for defendant.

MARTIN, District Judge. The declaration and stipulation are referred to and made a part hereof.

Charles W. Moore of Bridgeport filed in this court his voluntary petition in bankruptcy on the 10th day of August, 1907, and adjudication immediately followed. Hereafter I refer to said bankrupt by using his name. The said Moore was a dealer in junk and metals, and had been for several years. The defendant came to this country from Russia about 16 years ago, uneducated and unable to speak our language. After being here a few years he began dealing in metals and junk, formed the acquaintance of Mr. Moore, and carried on quite an extensive business with him. The defendant knew nothing about bookkeeping and kept no regular books, but had a small book which he carried in his pocket and made some memoranda thereon in aid of his memory. Mr. Moore employed Mrs. Graves, his sister, as a bookkeeper, and he also had a stenographer. On the 12th day of July, 1907, Mr. Moore was indebted to the defendant, for merchandise and loans of money, about $14,000, which indebtedness was for checks and notes that had been given for purchases and loans of the defendant. The notes were time notes, some of which were due in a few days and others in a longer time. There is no claim by the plaintiff that anything had occurred prior to the 12th day of July relating to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Mr. Moore's financial affairs that was brought to the attention of the defendant which should charge him with notice of the insolvent condition of Mr. Moore, but he does claim that on that day things transpired which should charge him, both in fact and in law, with such notice, and prior to his obtaining certain promissory notes and a check, being choses in action owned by Mr. Moore and received by him from parties to whom he had sold goods, which were then and there indorsed over by Mr. Moore to the defendant and thereafter indorsed by the defendant and collected and the proceeds appropriated to his own use. It is claimed that this, being within four months of the adjudication, was either a preferential payment or a conversion of a part of the estate of the bankrupt.

Mrs. Graves, Mr. Moore's bookkeeper, testified that on said 12th day of July she had examined the books of Mr. Moore and ascertained that he was in an insolvent condition, and, when the defendant came there on that day, she made known to him what she had discovered; that thereafter an arrangement was made whereby the defendant was to take said notes and check to a friend of his at New Haven, get them discounted, and bring back the avails thereof to Mr. Moore.

Mr. Moore testified that Mrs. Graves had not, at that time, said anything to him as to what she had discovered as to his insolvency, and that he did not hear that part of the talk between her and the defendant; but he gives the same version as to the passing over of the notes to the defendant as a bailee that Mrs. Graves gives.

The stenographer, Mrs. Reynolds, states that she heard the conversation between Mr. Moore and the defendant and gives the same version as to the agreement relating to said notes.

The plaintiff's evidence further tends to show that on the following day the defendant returned to Moore's office and informed Mr. Moore that this friend of his, a Mr. Price of New Haven, Conn., refused to pass over to him (the defendant) the proceeds of said notes and check because he (the defendant) was indebted to Mr. Price, and the best he could do was to get Mr. Price to give him (the defendant) credit for said notes, and that Mr. Moore was indignant and told the defendant that he could not hold the avails of those notes and check because, if he (Moore) should go into insolvency, the defendant would have to pay it back to Moore's estate. The same three witnesses, viz., the said Moore, Mrs. Graves, and Mrs. Reynolds, testified substantially alike relating to that talk.

The plaintiff also claims to recover for a check of $1,325, given by the defendant to said Moore, the payment of which was protested on the 15th of the same July. Mrs. Graves and Mr. Moore testified that the defendant and Mr. Moore exchanged checks at the time of the giving of the check in question, on the 10th day of July, and that Mr. Moore paid his check, but the defendant suffered his to go to protest.

The plaintiff also claims to recover for a car load of brass which the said Moore sold to the defendant and for which it is claimed the defendant received $4,140.80.

· The testimony ·of the plaintiff as to the car load of brass is that of the same three witnesses, Mrs. Graves, Mr. Moore, and Mrs. Reynolds.

·Mrs. Graves testified that she charged the defendant with a car load of brass, 24,767 pounds, on the 8th of July, at $4,140.80, but upon examination of the books, evidently the first entry that the witness referred to is upon page 248 where the defendant is credited with this car of brass at $3,962.72; that on page 266 of the same book he is charged with the car load of brass "not returned" at $4,140.80, under date of July 23d. I quote from her evidence:

"Q. 1 call your attention to page 248 (Exhibit K). That is where he rejected it. This gives the number of pounds again at 24,767. (No answer.)
"Q. That is under date July 8th, is it not? A. Yes.
"Q. Is that the original entry charging it to him? A. Yes, sir."

But the entry on the book credits it to him. Quoting again:

· "Q. I call your attention to page 262, under date of July 8th. Will you read that entry, please? A. By invoice car of new scrap brass rejected July 10, $4,140.80."

The entry reads, as near as I can pick it out:

B. Epstein.
July 8.     By invoice for car
            new scrap rejected....................... $3,962.72
            "   July 10 invoice reject................   178.08     $4,140.80

Just what this entry means the witness did not explain. The next entry below is a deal with another party under date of July 22d. On page 266 is an entry:

"To car of brass amounting to............... $4,140.80
not returned ........................................ $4,140.80

She further testified that the defendant notified Mr. Moore on July 10th that the car of brass was rejected by the American Pin Company, and that Mr. Moore directed him to ship it to a party in Boston.

Mr. Moore testified that the brass was to be 16 cents a pound, was to be high brass scrap and thin; but, while it was thin, it was not actually thin enough for the purposes wanted.

"I asked him for an advance on the car load of brass, and I think the first time I asked him he put me off; he didn't know about it. Then the next time I asked him he said they couldn't use it on account of it being, too thick. That was about the 10th or the 9th or the 12th or 13th of July. (He couldn't tell exactly when it was.)
"Q. Your book shows shipment was made on the 8th day of July? A. Then I should say it was possibly back a couple of days more; must have been between the 10th and 11th. I think it must have been on the 11th anyway.
"Q. What did you say to him when he canceled the order? A. I was very much disappointed. I told him if he couldn't use it to ship the car to Boston to my order. He said all right, he would do it. Then I immediately called up another party in Boston."

·: · Testified that he received from that Boston party, James Stewart · & Co., $3,000 on that car.

Mrs. Reynolds remembers just enough to bear upon the contention

that the title went back to Mr. Moore. She testifies that she heard the talk whereby the defendant said the car was rejected and Mr. Moore told him to ship it to Boston and he agreed so to do.

The defendant's testimony upon these several claims of the plaintiff is substantially as follows:

That on the 10th day of July he shipped to Mr. Moore a car load of different classes of metal, which invoiced at $3,828.27, and that at the time of said shipment Mr. Moore was indebted to him for quite a large amount. That just prior to the shipment of said merchandise, and about the 8th of July, Mrs. Graves sent to him Mr. Moore's check in blank, which she afterwards explained by phone, saying that at the time the check was sent Moore was away and she did not know for what amount the check should be, but that Mr. Moore had then returned and stated to her that it might be from $4,000 to $4,500. That they finally agreed by phone that it should be $4,300, and the check was so filled out and deposited by the defendant for collection. That soon after Mr. Moore called the defendant by phone and said to him: "I can't meet that $4,300 check. If you can help me out with a small check, I will be able to meet it." So it was arranged that the defendant should give to Mr. Moore a check for $1,325 to help him meet the check for $4,300 that Moore had given to the defendant, but on the 11th of July Mr. Moore called him again by phone and said he could not meet the check for $4,300 even with the use of the $1,325 check of the defendant, and then said to him, using the language of the witness:

"'Come down; I have got some papers, and we will straighten it out.' I asked if I should stop payment on the check, and he said, 'Yes, and I will give the check back to you when I get it.'"

So on the 12th he went to Mr. Moore's place of business at Bridgeport, arriving there about noon; but before going he notified the bank to stop payment on that check. That on his arrival at Mr. Moore's office Mr. Moore called him into his private office and took out four notes, one for $1,350, one for $3,601.20, one for $418.18, and one for $2,000, and a check on the Cheshire Brass Company for $1,800, and that Mr. Moore stated that he had some papers there, some notes, that he could not discount at his own bank because he was, using the language of the witness, "full up" at his bank, and that, if the defendant wanted them, he might have them, whereupon they were indorsed over to him. That the Cheshire Brass Company check was not in the original package that was first passed over, but Mr. Moore went out into the other office and got that later on and handed that to him and told him that the Cheshire Brass Company was doubtful, and that he wanted him to collect that as soon as possible. That later Mr. Moore handed him Exhibit 14, which exhibit is a sheet of note-size paper, with the following printing thereon:

Statement.

M                              Bridgeport, Conn.       190
To C. W. Moore,
         Dealer in Metals, Drosses, etc.
              418 Housatonic Avenue.
      Terms, Cash.

Below a heavy red line on said paper is written, in the handwriting of Mrs. Graves, the words and figures:

| | |
|---|---|
| B. Lissberger note.................................3,601.20 | |
| Sterling Smelting.................................2,000.00 | |
| "          "          ............................... 480.18 | |
| M. M. Robinson.................................1,350.00 | 7,431.38 |

Notes given. B. Epstein.

That he then went to New Haven, but did not arrive there until after banking hours, and he interviewed Mr. Price, a friend of his, and gave him said check for $1,800 with instructions to collect it as soon as possible. That he stayed there overnight, and on the next day went to New York, stopping off a train at Bridgeport, and called on Mr. Moore and explained to him what he had done about the check, which Mr. Moore said was all right. He denies ever having exchanged checks with Mr. Moore or receiving any information, prior to or on the 12th day of July, that Mr. Moore was insolvent, or that he ever became a bailee of said notes. He denies having any talk with Mrs. Graves about Mr. Moore's financial standing on said 12th day of July, and affirms that when he received those notes he understood that they were passed over to him as part payment for the general indebtedness of Mr. Moore to him.

This raises a serious question of fact, about which I have had much trouble and to which I have devoted a great deal of time in an effort to satisfy myself as to the truth. As it stands at first sight, it is three witnesses against one; but that weight of evidence is met with a serious inconsistency and improbability. The defendant, while not a scholar, is a thrifty, active, bright man, and in the handling of business, with which he is familiar, is considerably above the average. He well knew the effect of indorsing paper, which he must do to get the cash on said notes and check. He had accumulated a substantial sum of money, and on the occasion in question had a balance in the bank of upwards of $20,000, and was not indebted to Mr. Price and did not leave the notes with him, but put them into the bank for collection. If the plaintiff's evidence is true, he did a decidedly foolish thing. That is to say, he accepted of choses in action, the face value of which exceeded $9,000, knowing that he must indorse them and become personally responsible thereon, and carry the funds back and deliver them to Mr. Moore, who was his debtor for about $14,000, and not get a dollar in hand for it himself—only a promise of the payment of that note of $3,000 due July 17th—and all this after being informed by Mrs. Graves that Mr. Moore was a bankrupt; hence the defendant was liable to lose the whole of said $14,000 and be holden in addition for over $9,000, some of it, at least, questionable paper, and permit a car of scrap worth $3,828.27 to be delivered to Mr. Moore that he might stop in transitu. Besides this, Mrs. Graves testified that the check for $1,325 was obtained by an exchange of checks of the same amount; that Mr. Moore paid his check; but the defendant suffered his to go to protest; and that the exchanging of checks between Mr. Moore and the defendant was of frequent oc-

currence. If that is true, the books, checks, and check stubs ought to show it. The defendant says that, while he had made loans to. Mr. Moore and checked them out of his bank account, he never swapped or exchanged checks with him, so on the trial it was apparent that this was an important issue, as Mr. Moore and Mrs. Graves were swearing one way and the defendant another. If Mr. Moore gave the defendant a check in exchange for this $1,325 check, Mr. Moore's check stub and the paid check must have been in his hands, and both he and Mrs. Graves say that all their papers were turned over to the trustee, therefore they must now be in the trustee's (plaintiff's) hands; and yet that check or the stub is not produced, nor any other check or check stub that tends to establish the fact that these parties ever exchanged or "kited" checks.

As to this particular transaction, the defendant is corroborated by the $4,300 check that Mrs. Graves sent to him, signed by Mr. Moore in blank, and which she authorized the defendant, over the phone, to fill out for that amount. That check was in the bank unpaid when the defendant says he talked with Mr. Moore over the phone about it on July 11th. It was still in the same condition on the 12th, at the time of the transaction relative to the notes, and on the 13th, when the plaintiff's evidence tends to show that Moore was offended because the defendant did not bring back the avails of the notes and check that were handed to him on the 12th. The defendant is further corroborated by the entries that Mrs. Graves made upon the books of Mr. Moore. On the ledger, so called, under date of July 12th, and on B. Epstein's page, this entry appears:

To notes 253 (referring to the page journal) $7,432.38

This entry is made in a solid column of writing and figures, with an entry below it, indicating it was charged that day, and turning to the journal, on the page referred to, we find said page to be filled, with only one blank line between the accounts of different parties, and under date of July 12th the following appears:

B. Epstein.

| | | |
|---|---|---|
| To Cheshire check | $1,800.00 | |
| Lissberger note | 3,601.20 | |
| Sterling | 2,000.00 | |
| " | 480.18 | |
| M. M. Robinson note | 1,350.00 | $7,432.38 |

In her footing she did not include the check of $1,800 and made an error of $1. It is a straight charge to Mr. Epstein and made that day, as there are entries of debit and credit with other parties above and below this entry under that same date. There is no entry on the book indicating that he was made a bailee.

Again, I have searched these books carefully for a corroboration of Mrs. Graves' statement that from the books she discovered that her brother was insolvent on said 12th day of July, and on that day told the defendant what she had learned. I am unable to discover how she, or any one else, could, from an examination of those books, form

any idea as to the financial standing of Mr. Moore at that time or at any other time. I refer to the testimony of William Moore, an accountant, and find his testimony bearing upon the value of said books to be correct.

Again, if Mrs. Graves' version is true, she told the defendant, to whom they were heavily indebted, what she had discovered in searching the books, yet did not make it known to Mr. Moore, though she was his sister and in his employ.

Besides, the appearance of these witnesses upon the stand impressed me unfavorably. Mr. Moore swore in his examination before the referee in bankruptcy that he had no idea that he was insolvent until about the 1st of August, 1907. In the trial of this cause, he said he began to be suspicious as to his solvency within two or three days of the 12th of July, and then finally concluded that it was two or three, or three or four days before the 12th of July. He further swore that he never mentioned that to any one until about the 15th or 16th of July; yet he corroborates the story that Mrs. Graves tells as to what occurred on the 13th of July, when it is claimed that he was offended because the defendant did not bring the avails of said notes and check. He claimed, on this trial, that the reason he swore before the magistrate that he had no suspicion of his solvency until the 1st of August was to protect James S. Stewart & Co., to whom he had made payments all through said July, so the question arises whether he may not be swearing falsely now to protect that firm or some other creditor who may now be his favorite.

Counsel for the plaintiff strongly relied, in argument and brief, upon the testimony of the stenographer, Mrs. Reynolds. She was testifying to a matter that occurred between five and six years ago and which was of no interest to her; no reason why she should listen to it or remember it for any length of time; no entry or memoranda to help her memory. She said:

"Mrs. Graves and I looked over the books. I remember we went over the books together and found the liabilities were over $200,000 and the assets between $70,000 and $80,000."

In my opinion, neither she nor Mrs. Graves could find from the books anything of that sort. I am quite sure that Mrs. Reynolds could find no more than William Moore, the accountant, or the court. I am not inclined to think she did not intend to tell the truth; my belief is that Mr. Moore and his bookkeeper, Mrs. Graves, were unwilling to admit to other creditors that they had made this large payment to Mr. Epstein, so they concocted this story to shield Moore from the criticism and attacks of his other creditors, and that they talked in the presence of Mrs. Reynolds as to what occurred, calling her attention to the fact that she was present, and thus she was led to believe that she was present; but, whatever may have caused her to give this testimony, my conclusion is that it is not reliable.

The defendant testified that Mr. Moore told him, while the market was on a decline in the summer of 1907, that he could stand a drop of $50,000. Mr. Moore testified that that talk was the year before, but it does not appear that there was any drop in the metal market in 1906.

Mr. Moore's appearance upon the stand, his testimony before the referee in bankruptcy, his dealings with other customers than the defendant all along from May 1st to the last of July, the total lack of impersonal accounts, or accounts of profit and loss, and the nondescript character of the books that Mrs. Graves kept, the fact that he did not claim that he consulted those books at all, and that when he did ascertain his insolvent condition it was by going over it in his own mind and not from any information imparted to him by his bookkeeper, and the fact that he never mentioned the subject to any one until several days after the 12th of July, lead me to the conclusion, and I so find the fact, that he did not know or believe on either the 12th or 13th of July that he was in an insolvent condition and could not have intended a preference July 12th.

I have considered the testimony of Lapides and Shares as to the sayings and conduct of the defendant soon after the occurrence of said July 12th. They were testifying to things that occurred several years ago, and such evidence must be weighed by first considering whether they correctly understood what the party said, whether they have correctly kept it in mind from thence to the present time, and whether they have truthfully reproduced it in court.

Mr. Shares' testimony relates more particularly to the silence of the defendant on a certain meeting of Mr. Moore's creditors and his talk with him thereafter about his silence, and what he said, which, as it seems to me, is not very material.

The testimony of Mr. Lapides presents another peculiar state of things. Mrs. Graves testified to telling the defendant that Mr. Moore was insolvent, and, further, that the defendant came to her soon thereafter and asked her to keep private everything that occurred in relation to those notes and checks, and both she and Mr. Moore testified that on the 13th of said July Mr. Moore told the defendant that he was liable to have to pay the avails of those notes over to his estate in bankruptcy, yet, according to Lapides, within a very few days thereafter the defendant was telling him, knowing that his father was a heavy creditor of Moore, that he (Epstein) was not a creditor of Moore; that he heard of Moore's financial condition and purchased a car of metal from him, exchanged checks with him, and stopped the payment of his own check, and got a lot of notes from Moore and kept them, thus giving away what he was asking others to keep secret, and telling of exchanging checks with Moore when, as I find the fact to be, there never was any exchange or "kiting" of checks between the defendant and Moore. It appears to me that the witness got that statement from Mr. Moore or Mrs. Graves, instead of from the defendant.

From an examination of the evidence relating to the note that became due July 17th, I find a statement of facts that is not discussed by counsel except as bearing upon other issues. The defendant says that Mr. Moore called him by telephone on the 18th of July and told him:

"He slipped through that note without paying it, and he sent two checks to cover that note. The two checks was made out to the Hurlburt National

Bank, and it was somebody's check. One check was the B. Lissberger check for $2,700, and the other one I don't know whose it was.

"Q. What did you do with those checks? A. I gave them to Mr. Phelps, the cashier of the Hurlburt National Bank, where the note was."

Defendant's Exhibit 10 is a letter from William H. Phelps, cashier of the Hurlburt National Bank, to Mr. Moore, under date of July 20th, and reads as follows:

"Mr. B. Epstein has delivered to us checks to the amount of $3,002.10, to cover your note and fees of that amount, which I return you herewith."

The note is produced by the plaintiff and is Exhibit 1. Defendant's Exhibit 11 shows the two checks for $2,700 and $302.10 that were received by that bank. The cashier's letter was probably dated the day or the day after the receipt of the checks, so it appears that Mr. Moore, on the 18th, voluntarily paid the defendant that note with these checks, and on the 19th or 20th the defendant had those checks discounted and the note canceled.

Mrs. Graves and Mr. Moore testified that the arrangement on the 12th of July, when the notes and check were delivered to the defendant, was that the $3,000 note which was to become due on the 17th of July was to be paid out of the proceeds thereof. I am unable to reconcile this story with the voluntary act of Mr. Moore, with the full knowledge of Mrs. Graves, in giving the defendant two checks, one for $2,700 and the other for $302.10, within a week, to pay that same note and the protest fees thereon. If their story was correct, Mr. Moore would naturally say, "You have kept the proceeds of those notes, and out of it this note was to be paid and canceled."

There is no allegation in the complaint that the delivery to the defendant of those two checks was a preferential payment, and no such claim in the brief of counsel for the plaintiff, so I give that matter no further consideration except as a circumstance bearing upon the testimony of Mr. Moore and Mrs. Graves.

At the time that the defendant sold to Mr. Moore the car load of scrap for $3,828.27, he had this check that was sent to him in blank and subsequently agreed over the telephone should be $4,300. He had shipped the car, and, as near as I can gather from the evidence, it was not delivered until after July 12th, so, when Moore informed Epstein that even the defendant's check for $1,325 would not enable him (Moore) to meet the check for $4,300, the defendant might then have stopped the car in transitu, but, instead of taking that course, he went to Mr. Moore's office to ascertain what papers he proposed to turn over to him. This car of scrap had not passed beyond the defendant's control, but he would not care to stop its delivery if he received an amount equivalent to the value of said car of scrap. He did receive that amount and more.

[1] I find that, at the time the defendant received these notes in question and the check, he received them to apply as payment or as collateral security. He had a right to take the value of that car in collateral whether he knew Mr. Moore was insolvent or not. Mr. Moore's insolvent estate was benefited by the receipt of that car, and it became a part of the assets of the estate, and the estate suffers nothing by the defendant receiving from the estate its value. Accord-

ing to the plaintiff's evidence, the defendant was to have the payment of the note of $3,000 due July 17th out of the avails of said notes; hence, on the undisputed. facts, the defendant could hold at least $3,000 for the note and $3,828.27 for the car of scrap. The check for $1,800 was adjusted between the plaintiff trustee and the defendant, so there can be no recovery for that.

As to the car of brass for which the plaintiff claims to recover, I find that it was bought by the defendant July 3d. I have examined the evidence on the plaintiff's claim that said car was rejected on account of part of it being of inferior quality. On that question I find that the defendant never rejected the car nor canceled the contract. The most that the evidence tends to show is that the American Pin Company wrote the letter, plaintiff's Exhibit C, and thereupon the defendant notified Mr. Moore of the contents of that letter, but did not notify him, as the purchaser of the car, that he (the defendant) rejected it. The transaction relating to this car is the same as that of other cars of merchandise bought and sold by these parties in their dealings with each other. When anything was found deficient as to quantity or quality, the parties made it right. There was no reason why the defendant should reject this car unless Mr. Moore refused to make it right. There is no claim that he did refuse so to do.

[2] As to the check for $1,325, I find that it was given by the defendant upon Mr. Moore's request that he might thereby be enabled to meet the check for $4,300. I further find that Mr. Moore telephoned the defendant, on July 11th, that he could not meet the $4,300 check, given by the use of the $1,325 check, and suggested that the defendant might as well stop the payment, and the defendant did stop the payment on the morning of the 12th, and it got around to his bank on the 15th, when it was protested, so my conclusion is that there is no liability on the part of the defendant for the check of $1,325, nor for the $400 on the $1,800 check, as that was adjusted between these parties when the defendant proved his account in the bankruptcy court.

[3] I find that, while the evidence satisfies me that the defendant, in the exercise of his habit of thrift, believed it was safer to get Moore's indebtedness to him reduced, and was anxious to do so, his desire in that regard being stimulated by the fall in the market prices of metals in which these parties were dealing, there is not sufficient evidence to hold that the defendant, on said July 12th, knew, or ought to have known, that Mr. Moore was insolvent, and that the transfer of those notes and the check was intended as a preference over other creditors.

I think I have considered and discussed all the essential evidence adduced bearing upon the defendant's knowledge of the bankrupt's financial condition at the time of the acts set out in this complaint.

I find that the plaintiff made no demand of the defendant for any of the merchandise or choses in action for which a recovery is sought under this complaint.

All the exhibits are referred to and made a part of this finding of facts, so far as the same are material.

Upon the foregoing facts, judgment for the defendant with costs is hereby directed.